Sire Plan Portfolios, Inc., Appellant, v. Charles F. Carpentier, Secretary of State of State of Illinois, Appellee.

Gen. No. 46,714.

First District, First Division.

January 9, 1956.

Released for publication February 27, 1956.

Wisch and Crane, of Chicago, for appellant; Myron E. Wisch, and James E. Brown, both of Chicago, of counsel.

Latham Castle, Attorney General of the State of Illinois, of Chicago, for appellee; Samuel H. Young, and Thomas S. Chuhak, both of Chicago, of counsel.

JUDGE NIEMEYER delivered the opinion of the court.

Plaintiff appeals from an order entered in an administrative review suit affirming the order of defendant, the Secretary of State, prohibiting the sale or offering for sale in the State of Illinois of fractional undivided interests (called by plaintiff "units of co-ownership agreements") in real estate in the State of New York under a plan hereinafter fully described and called the Sire Plan, after a hearing and finding that the sale of the units of ownership was not in accordance with the provisions of the Illinois Securities Law of 1953 (Ill. Rev. Stats. 1953, chap. 121½ [Jones Ill. Stats. Ann. ch. 121]).

The plaintiff Sire Plan Portfolios, Inc., a New York corporation, hereinafter referred to as Sire, sells fractional undivided interests in income producing improved real estate by offering units of ownership. In the instant case Sire entered into a contract to purchase an apartment building in New York City for $244,589.12, and offered for sale 280 units of ownership at $500 a unit on the following plan. Under the terms of a "Purchase Agreement" between the purchasers of units and Sire the record title of property is to be transferred to individuals named by Sire as trustees for the benefit of all purchasers of units; pending the acquisition of title and the sale of sufficient units, all funds derived from the sale of units are to be deposited in escrow in a bank at Farmingdale, New York, and bear interest at 4 per cent until title to the real estate

355

is actually transferred to the trustees; on receiving the title the trustees shall execute, record and deliver a "Declaration of Trust under the Sire Plan" and "Prime Lease under the Sire Plan" to Sire or its nominee, as lessee, and then convey to each unit purchaser his undivided proportionate interest in the property as a tenant in common with the remaining unit purchasers, subject to the declaration of trust and prime lease.

Under the terms of the prime lease the lessee assumes the responsibility of the physical management of the property for compensation at the rate of 5 per cent of the gross annual rental income, plus the payment in the instant case of 25 per cent of the net income of the property in excess of $14,000 at the end of any fiscal year. The lessee is also to see that all expenses are paid and that the profits are distributed pro rata to the co-owners.

In the preliminary agreement provision is made for the withdrawal of the unit purchaser at any time before the title to the property is acquired, and the refund of the money paid by him with interest. Under the declaration of trust the owners of 60 per cent or more of the units of ownership may remove the trustees, appoint new trustees or terminate the trust.

The decisive question is whether the transaction is merely a sale and purchase of a fractional undivided interest in the real estate, as contended by plaintiff, or an investment contract and, therefore, a security as defined in section 2 of the Illinois Securities Law of 1953 [Ill. Rev. Stats. 1953, chap. 121½, § 137.2; Jones Ill. Stats. Ann. 13.55(2)]. The definitions of "security" in the Federal Securities Act of 1933 and the Illinois Securities Law of 1953 are almost identical. Investment contracts are included in the term "security" as defined in each act. In Securities & Exchange Commission v. W. J. Howey Co., 328 U. S. 293 (1946), a case arising under the Federal Securities Act, the court

said (p. 298) that the term "investment contract" under the blue sky laws of the states

"had been broadly construed by state courts so as to afford the investing public a full measure of protection. Form was disregarded for substance and emphasis was placed upon economic reality. An investment contract thus came to mean a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.' . . .

". . . In other words, an investment contract for purposes of the Securities Act means a *contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promotor or a third party,* it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." (Emphasis added.)

In the Howey case the respondent Howey Company and Howey-in-the-Hills Service, Inc. (hereinafter called the Service company) were Florida corporations under direct common control and management; respondent owned large tracts of citrus acreage in Florida; for several years it had planted 500 acres annually, keeping half of the groves itself and offering the other half to the public in small parcels of one or several acres to help finance additional developing; the Service company was engaged in cultivating and developing citrus groves and the harvesting and marketing of the crops; each prospective purchaser was offered a land sales contract and a service contract with the Service company; upon full payment of the purchase price the purchaser received a warranty deed for his tract; under the service contract the Service company was given full discretion and authority over the cultivation of the groves and the harvesting and marketing of the crops; it was accountable only for the allocation of the

357

net profits based upon a check made at the time of picking; it was paid a specific fee, plus the cost of labor and material.

After pointing out that the respondent and the Service company were offering "something more than fee simple interests in land, something different from a farm or orchard coupled with management services," and that the resulting transfer of the rights in land was purely incidental, the court said (pages 300–301):

"Thus all the elements of a profit-seeking business venture are present here. The investors provide the capital and share in the earnings and profits; the promotors manage, control and operate the enterprise. . . . *The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.* . . . The statutory policy of affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae." (Emphasis added.)

The transaction was held to be within the Federal Securities Act. The Illinois cases are consistent with this holding. In Prohaska v. Hemmer-Miller Development Co., 256 Ill. App. 331 (1930), the court held that a transaction calling for a warranty deed to farm land in South Dakota was within the Illinois Securities Law, and quoted with approval 37 Corpus Juris, page 275, as follows:

"The term 'securities,' as used in these laws (Blue Sky Laws), means written assurances for the return or payment of money, except where special definitions are given by the statutes. . . . It means the investment of funds in a designated portion of the assets and capital of a concern, with a view of receiving a profit through the efforts of others than the investor; and in this sense includes what are termed 'security' or 'investment' contracts or 'speculative securities.'"

In McCormick v. Shively, 267 Ill. App. 99 (1932), the court held that the transaction was a simple contract for the purchase and sale of real estate and not within the Securities Act, the vendor not being obligated to do anything other than the delivery of a deed for the purchase price, and said (p. 102) : "The statute clearly contemplates that only such contracts shall be considered investment contracts as provide for the payment of money at a future time to the purchaser or holder of the contract."

Plaintiff attempts to distinguish the character of the services rendered in cultivating, developing and marketing the produce of agricultural land and the management and rental of an apartment building. It insists that the services to be rendered by Sire under the prime lease are merely ministerial and administrative. With this distinction we cannot agree. An apartment building, even when fully rented, is not self-operating, leaving nothing for the manager to do except to collect rents, pay bills and remit the net profits to the respective co-owners.

Plaintiff further suggests that the right granted to the owners of 60 per cent or more of the units of ownership to remove the trustees, appoint new trustees or terminate the trust, is evidence of a control of the management and operation of the enterprise not present in the cases hereinbefore discussed. This control is illusory, not real. The situation of the holders of units of ownership is not unlike the plight of the widely scattered holders of small beneficial interests or shares of stock in reorganized corporate owners of apartment buildings following foreclosure.

The profits and income, if any, resulting from the Sire plan are produced by the efforts of Sire and its nominees in managing its properties, purchased with the money of many distant investors in small fractional undivided interests, without real control of the enter-

prise. It is an investment contract within the Illinois Securities Law of 1953, and the order is affirmed.

Order affirmed.

FRIEND, P. J. and BURKE, J., concur.