BOATMEN'S BANK OF BENTON, Plaintiff-Appellee, v. JAMES P. DUR-HAM, Defendant and Third-Party Plaintiff-Appellant (J. Lloyd Tomer, Third-Party Defendant).

Fifth District   No. 5—89—0372

Opinion filed September 5, 1990.

Harris & Lambert, of Marion, and Darrell Dunham, of Carbondale, for appellant.

Pamela Lacey, of Hart & Hart, of Benton, for appellee.

JUSTICE CHAPMAN delivered the opinion of the court:

Boatmen's Bank of Benton (Boatmen's Bank) filed a complaint to collect amounts due on a $20,000 note executed by James Durham in September 1985. Durham raised defenses and filed counterclaims based on previous transactions involving a note executed by Durham in 1978. Boatmen's Bank filed a motion for summary judgment, which was granted by the trial court. Durham appeals. We affirm.

■ Summary judgment will lie only where there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005.) The primary function of the summary judgment procedure is to enable a court to determine whether there is any material issue of fact to be tried by a jury. (*Gasdiel v. Federal Press Co.* (1979), 78 Ill. App. 3d 222, 226, 396 N.E.2d 1241, 1244.) With this in mind, we will examine Durham's contention that the trial court erroneously granted Boatmen's Bank's motion for summary judgment.

In March of 1978, Bob Phillpot advised J. Lloyd Tomer of an investment opportunity to purchase Elvis Presley's customized airplane for $2,086,000. In order to exercise an option to enter into a sales contract for the purchase of the airplane, Tomer and Phillpot needed $550,000 by March 31, 1978. Bob Phillpot had already obtained $150,000 toward the amount due on the option. On March 30, 1978, Tomer and Phillpot approached Howard Payne, president of Boatmen's Bank, regarding their need to obtain the balance of $400,000. Payne advised the men that he could not loan the money to them, but

that he would approve four $100,000 loans to James Durham and three other named individuals. Four notes of $100,000 each were then given to Tomer.

Tomer left Boatmen's Bank and proceeded to James Durham's residence, where he informed Durham of the investment opportunity. Tomer told Durham that Howard Payne had already authorized a $100,000 loan to Durham, and that Durham need only sign one of the notes. Durham testified that he then telephoned Howard Payne to confirm whether it was true that Payne had already authorized a $100,000 loan to Durham. Durham recalls that Payne advised him that he thought the investment was a "good deal," that a member of the bank's board of directors had invested in it, and that he personally was not investing in the deal only because it would be a conflict of interest for him to do so. Howard Payne acknowledged that he spoke with Durham regarding the note and the investment, but testified that the telephone conversation to which Durham refers did not take place until approximately 30 days after the note was signed.

Durham testified that after speaking with Payne, he dated the note, filled in the amount of $100,000, and he and his wife signed it. Tomer also signed the note, although it is not clear when he did this. Tomer took Durham's note, obtained the necessary signatures on the three remaining notes, and returned to the bank. Payne accepted the notes and gave a cashier's check for $400,000 to Tomer in the name of the seller of the airplane, Omni Aircraft.

Later that afternoon Durham went to the bank, but was informed by a bank employee that Tomer had already departed. Durham testified during his deposition that at that time he assumed that a loan had not been made to him on the note because $100,000 had not been deposited into his account. Payne's deposition testimony revealed that the bank was not in the usual practice of disbursing loan proceeds to anyone other than the borrower of the money, and that Durham had not given Payne authority to draw a check to Omni Aircraft. Nonetheless, the $400,000 check issued to Omni Aircraft included the $100,000 loaned to Durham. Durham testified that he did not know for certain that he was an investor in the airplane until July of 1978 when he received a notice from Boatmen's Bank stating that the note was due. Durham testified that while he was aware that Tomer had possession of the airplane in April of 1978, he did not know that Tomer had used the $100,000 note signed by the Durhams to secure possession of the aircraft.

In July of 1978, when Durham received notice from Boatmen's Bank that the note was due, he telephoned Payne and advised him

that it was Durham's understanding that the note was for a term of one year. Payne assured Durham that he would "take care of it." Durham testified that the only discussions he had with Payne regarding the note were the one in July and the one on March 30, 1978, when the note was signed.

The plan to complete the purchase of the airplane subsequently fell through and the airplane was eventually repossessed. The $550,000 paid on the option to purchase was forfeited. By August of 1979 the $100,000 note Durham executed had accrued interest of $11,687.40. Payne advised Durham and Tomer that they would have to execute a renewal of the $100,000 note, and Durham and Tomer thereafter signed a note for $111,687.40 on August 14, 1979. Durham's wife did not sign this note. Durham testified at his deposition that at the time he signed the August 14, 1979, note he was aware that the airplane had been repossessed.

In September 1980, Payne agreed to sever the liability on the August 14, 1979, note between Tomer and Durham, allowing each of them to execute individual notes in the amount of $60,000. Tomer and Durham agreed to this arrangement. On the same day that the $60,000 notes were executed the 1979 note was marked paid. Durham then made payments on the $60,000 note which reduced his indebtedness to $20,000 by the time the note was again renewed in September 1985.

On January 3, 1986, Durham's new attorney sent a written notice to Boatmen's Bank advising it that he considered the transactions with the bank relating to the sale of the airplane to be in violation of Illinois securities law. The letter stated that Durham was rescinding the purchase of the security. Durham made no payments on the $20,000 note.

Boatmen's Bank filed a complaint with the circuit court on May 12, 1986, alleging that Durham had defaulted on the $20,000 note. Boatmen's Bank prayed for judgment in the amount of $20,000, together with interest, costs and attorney fees. Durham filed responsive pleadings admitting that he executed the note but denying that he received consideration for the loan. The trial court struck defendant's affirmative defense of failure of consideration. Durham also raised the affirmative defense of common law misrepresentation. Durham's counterclaim raised allegations of common law fraud, negligent misrepresentation, and violation of the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1989, ch. 121½, par. 137.1 et seq.). Boatmen's Bank filed a motion for summary judgment which was granted. The trial court entered judgment in the amount of $40,560.48, which included the prin-

cipal due on the $20,000 note, interest, and attorney fees.

Durham first argues that the trial court erred in striking his affirmative defense of no consideration which would render the note unenforceable. The record reflects that Durham's affirmative defense of failure of consideration was stricken by the trial court at an early stage of the proceedings. When plaintiff's motion for summary judgment was heard consideration was not an issue addressed by either Boatmen's Bank or the court. However, since Durham did raise the issue of failure of consideration during the summary judgment hearing, we will not consider the issue waived.

We will assume, as defendant contends, that the $20,000 note at issue was a renewal note, traceable to the March 30, 1978, note. We find that there was consideration as to each of the notes executed by Durham. With regard to the consideration underlying the $100,000 note executed in 1978, it is undisputed that the proceeds of that loan went toward the option to purchase the airplane. Durham argues that he did not receive the benefit of the consideration for which he bargained when he signed the note and cannot be held bound on the note. He maintains that after he left the bank on March 30, 1978, he assumed that the loan proceeds on the note he signed had not been used toward the purchase of the airplane because $100,000 had not been deposited into his account, and he had not given anyone authority to draw a check on the loan proceeds.

Notwithstanding Durham's claim that he was unaware that the bank had disbursed the proceeds on the note, Durham does not dispute that he knew the loan proceeds had been used to purchase the airplane in July of 1978 when Payne advised him that the note was due. Durham's only quarrel at that time was that he thought the 1978 note was due in one year. It is clear that there was consideration passing to Durham for the execution of the note. It is not necessary to establish that the maker of the note received the consideration therefor; it is sufficient if consideration was extended on the strength of the maker's signature, in consideration of the maker's promise to repay. (*Burke v. Burke* (1980), 89 Ill. App. 3d 826, 828, 412 N.E.2d 204, 206.) We find that consideration was both bargained for and received by Durham on the 1978 note.

There was also consideration given in exchange for the 1979 note for $111,687.40. Consideration is defined as some benefit to the promisor or detriment to the promisee. (*Burke*, 89 Ill. App. 3d at 828-29, 412 N.E.2d at 207.) There is a presumption that a negotiable instrument has been executed for consideration. (*Stolzenbach v. Pagoria* (1979), 71 Ill. App. 3d 863, 866, 390 N.E.2d 376, 378.) It is apparent

that consideration was given in exchange for execution of this note by virtue of the undisputed testimony that Boatmen's Bank released Durham's wife from liability on the original note and allowed the recapitalization of the principal and interest due on the 1978 note. Likewise, the release of approximately one-half of Durham's liability when he executed the 1980 note for $60,000 was consideration received by Durham. The subsequent extensions and renewals on notes due the bank satisfied the required consideration. The execution of a note to secure an antecedent or existing indebtedness needs no consideration. (Ill. Rev. Stat. 1989, ch. 26, par. 3—408; *Stolzenbach,* 71 Ill. App. 3d at 866, 390 N.E.2d at 378.) In view of our finding that consideration was given in exchange for execution of each of the notes, we do not find that the trial court's failure to specifically address the issue in ruling on the motion for summary judgment was error.

■■ Durham also contends that the trial court erred in granting summary judgment for the plaintiff because there are questions of fact as to whether Boatmen's Bank violated Illinois securities law. We recognize that the courts have liberally construed the Illinois Securities Law to protect the public from deceit and prevent fraud in the sale of stocks, bonds and other securities. (See *Martin v. Orvis Brothers & Co.* (1974), 25 Ill. App. 3d 238, 245, 323 N.E.2d 73, 78-79.) However, the maxim of liberal construction means that courts should accept and follow the law's spirit instead of limiting it to its letter as in derogation of the common law. (*Condux v. Neldon* (1980), 83 Ill. App. 3d 575, 584, 404 N.E.2d 523, 530.) In order for Durham to prevail under the Illinois Securities Law of 1953, it must be shown that Boatmen's Bank was a participating underwriter involved in the sale of a security. Ill. Rev. Stat. 1989, ch. 121½, par. 137.1 *et seq.*

The question we must address is whether the transaction involving Boatmen's Bank in this case is a securities transaction within the meaning of the statute. The Illinois Securities Law of 1953 defines "security" as:

> " 'Security' means any note, stock, treasury stock ***, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." (Ill. Rev. Stat. 1989, ch. 121½, par. 137.2—1.)

In this case a note was signed by Durham, payable to Boatmen's Bank, in exchange for Boatmen's Bank loaning Durham $100,000. Although the money was put toward the option to purchase an airplane, we do not find that this qualified the transaction as a security. In de-

termining whether an instrument or a transaction is a security under the statute, form is not to be regarded over substance. The substance of the transaction, the relationship between the parties, and economic reality determine whether a transaction involves a security and whether a purchaser is entitled to protection afforded by registering or reporting an instrument pursuant to securities laws. *Saunders, Lewis & Ray v. Evans* (1987), 158 Ill. App. 3d 994, 996, 512 N.E.2d 59, 61; *Condux*, 83 Ill. App. 3d at 585, 404 N.E.2d at 525; *Polikoff v. Levy* (1965), 55 Ill. App. 2d 229, 234, 204 N.E.2d 807, 809, *cert. denied* (1965), 382 U.S. 903, 15 L. Ed. 2d 156, 86 S. Ct. 237.

Both the Illinois and the Federal courts have emphasized that a security within the meaning of the securities laws is a contract, transaction or scheme whereby one person invests his money in a common enterprise on the theory that he expects to receive profits solely from the efforts of others. (*Sire Plan Portfolios, Inc. v. Carpentier* (1956), 8 Ill. App. 2d 354, 357, 132 N.E.2d 78, 79; *Securities & Exchange Comm'n v. Howey Co.* (1946), 328 U.S. 293, 301, 90 L. Ed. 1244, 1251, 66 S. Ct. 1100, 1104.) In substance, Boatmen's Bank was acting as a lender in this case. Howard Payne did not have a personal stake in the investment other than his interest in seeing to it that the borrower of the funds was a good financial risk for Boatmen's Bank. It is undisputed that Durham was aware of the extent of the bank's participation in the investment, namely that of a lender. The testimony of the parties reveals that Payne did advise Durham that in Payne's opinion the investment was a sound one. This, however, coupled with Payne's relinquishment of the $100,000 secured by Durham's note is not sufficient to establish that Payne was an active participant in the investment scheme so as to render the note a security under the statute. We find no authority for extending the securities law to the plaintiff here, and we will not do so.

Even if the transaction between Boatmen's Bank and Durham did involve securities, the Illinois Securities Law would not apply because Boatmen's Bank is not an underwriter. An underwriter is

> "any person who has purchased a security from an issuer or a controlling person with a view to, or who offers or sells a security for an issuer or a controlling person in connection with, the distribution thereof, or who participates or has a participation in the direct or indirect underwriting of such distribution." (Ill. Rev. Stat. 1989, ch. 121½, par. 137.2—6.)

Durham argues that the bank's role here was more than that of a passive lender. Durham maintains that the bank took on the function of counselor, advisor, and solicitor of the investment, thereby directly ex-

erting its influence in enticing Durham to partake in the investment. We disagree.

It is clear that the bank's primary involvement in the transactions which took place was that of a lender. Boatmen's Bank was aware of the use to which the money was going to be put, and Howard Payne did express his interest in the investment. However, Boatmen's Bank did not look to profit from the transaction other than by its ordinary banking charges for lending money. (See *Cobb v. Uplands Hardware Corp.* (1966), 68 Ill. App. 2d 158, 215 N.E.2d 298.) It is also true that the bank disbursed Durham's loan proceeds directly to a third party without any authority or approval from Durham. This conduct by the bank, although questionable, is not sufficient to label Boatmen's Bank an underwriter.

■ In view of our findings, we need not reach the issue of whether Durham waived his rights under the Illinois Securities Law. Yet there does remain the issue of whether the trial court erred in ruling that Durham waived any defenses and claims of common law fraud and negligent misrepresentation he may have had. A person defrauded in a transaction may, by conduct inconsistent with an intention to sue for damages for fraud, waive the right to sue. (*Kaiser v. Olson* (1981), 105 Ill. App. 3d 1008, 1014, 435 N.E.2d 113, 118.) Waiver will apply if a party, after discovering the alleged fraud and with full knowledge of its material aspects, engages in conduct which is inconsistent with an intention to sue. This is especially true when the conduct engaged in affords the defrauded party an advantage or misleads or prejudices the opposite party. (*Kaiser*, 105 Ill. App. 3d at 1014, 435 N.E.2d at 118.) In the instant case, the trial court's memorandum of decision provides in part that Durham "engaged in conduct inconsistent with an intention to sue" and waived his right to such defenses and claims. We concur.

■ Durham claims that Howard Payne solicited and encouraged him to invest in what Payne called a "sound investment." Durham argues that he relied on this misrepresentation. We do not see this as sufficient to overcome the court's finding that Durham waived his claims and defenses. Even if Payne made such remarks to Durham, such statements are regarded as mere expressions of opinion or promises upon which the other party has no right to rely. *Madison Associates v. Bass* (1987), 158 Ill. App. 3d 526, 540, 511 N.E.2d 690, 699.

The record shows that Durham knew on the day he signed the original $100,000 note that the money was to be his share in the investment in the airplane. In July 1978 when Durham received notice from Boatmen's Bank that the note was due, his sole complaint to

Payne was that Durham believed the note was for a term of one year. After the plane was repossessed, Durham executed a renewal on the original note which included the accumulated interest of $11,687.40. Several months later Durham consulted an attorney, and in September of 1980 a meeting was held at Boatmen's Bank at which time Boatmen's Bank effectively released Durham of $60,000 of his liability on his indebtedness by allowing him to execute a note for $60,000 instead of the approximately $120,000 then due. For approximately five years Durham made payments on the $60,000 note and reduced it to $20,000 by the time it was renewed in September 1985. It was not until January 1986 that Durham claimed any wrongdoing by Boatmen's Bank. While renewal of the note is not necessarily dispositive of Durham's intent to waive his cause of action on the original note, other conduct by the complaining party inconsistent with an intention to seek damages can result in a finding of settlement or waiver. Durham engaged in negotiations with Boatmen's Bank on several occasions to alter the terms of the notes due, all to the benefit of Durham. It was not until his indebtedness was reduced to $20,000 that Durham consulted with a new attorney and thereafter ceased making payments to Boatmen's Bank. One is not permitted to lie back and speculate as to whether avoidance or affirmance of a contract will ultimately prove more profitable. (See *Kaiser*, 105 Ill. App. 3d at 1014, 435 N.E.2d at 118.) Even if Durham's claims of fraud and negligent misrepresentation were true, he would not be entitled to relief because he remained silent on the matter for nearly seven years and during this time negotiated extensions and renewals on his indebtedness with Boatmen's Bank. Under the circumstances, we find that the trial court did not err in finding that Durham waived his common law defenses and claims.

The judgment of the trial court is affirmed.

Affirmed.

HARRISON and WELCH, JJ., concur.